**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **GLORIA VALDEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | |
| | § | **3:23-cv-02327-B** |
| **METHODIST HOSPITALS OF DALLAS,** | § | |
| | § | |
| **Defendant.** | § | |

**JOINT FINAL PRETRIAL ORDER**

## I.
## INTRODUCTION

Pursuant to the Scheduling Order, Local Rule 16.4, and Federal Rule of Civil Procedure 16, Gloria Valdez ("Plaintiff" or "Ms. Valdez") and Methodist Hospitals of Dallas ("Defendant" or "Methodist") file this Joint Pretrial Order.

Certain sections below have been submitted by, and represent the position of, only the Party whose name or designation is indicated in the section heading. The signatures of counsel below do not constitute agreement with, or admission or adoption of, any portion of this Order submitted individually by another Party to this action.

## II.
## PRETRIAL SUBMISSIONS

A.    **Summary of the Claims and Defenses**

**Plaintiff's Contentions:**

Ms. Valdez contends that her sex/gender/pregnancy were motivating factors in Defendant's decision to terminate her employment. Ms. Valdez contends that Defendant retaliated against her for engaging in protected activity as set forth in Texas Labor Code section 21.055. Ms.

Valdez also contends Defendant interfered with her FMLA leave rights by terminating her employment to deny her available FMLA leave.

Ms. Valdez worked for Defendant from September 2018 until she was wrongfully terminated on October 12, 2022, ***the day before*** Defendant expected her to start maternity leave. After working for Defendant in its Liver Institute for almost three years without incident, Ms. Valdez transferred to Defendant's Clinical Research Institute in June 2021 to be a Clinical Research Coordinator. Ms. Valdez reported to Jeny Rendon for the first few months, until Ms. Rendon resigned, without receiving any disciplinary action. After Ms. Rendon's resignation, the clinical research team was left with no manager for over six months, during which Ms. Valdez and her peers relied on each other for guidance and training. When Karen Castro became the new Clinical Research Manager in April 2022, it was brought to Ms. Castro's attention that some training or retraining would be necessary for the team.

After Ms. Valdez announced her pregnancy to the team, Ms. Castro began scrutinizing her performance to a higher degree than Ms. Castro was scrutinizing Ms. Valdez's non-pregnant peers. Ms. Valdez complained to Human Resources that she was being targeted by Ms. Castro due to her pregnancy and that she was concerned Ms. Castro intended to terminate her employment before she went on maternity leave. Following Ms. Valdez's report to Human Resources, Ms. Castro issued one disciplinary after another, going through Defendant's progressive discipline policy in a matter of 36 days—including weekends that Ms. Valdez did not work and six days for which Ms. Valdez was on medical leave related to pregnancy complications—and leaving no time in between for Ms. Valdez to improve her performance.

When Ms. Valdez submitted her formal request for maternity leave through Defendant's third-party provider, her managers received a notification that her leave was expected to begin on

October 13, 2022. Days before Ms. Valdez was terminated, Priyanka Acharya met with her and discussed the transition of her workload to other coordinators, under the guise that they were preparing for her maternity leave. Instead, Ms. Valdez was terminated **the day before** her maternity leave was expected to begin. The alleged non-compliance that was the "last straw" was minor formatting issues, like adding a page number, creating a signature line, etc., things other non-pregnant employees were not terminated for.

Ms. Valdez filed claims for (1) sex discrimination in violation of Texas Labor Code § 21.001, et seq. ("TCHRA"); (2) discriminatory discharge in violation of the TCHRA; (3) retaliation in violation of the TCHRA; and (4) FMLA interference in violation of 29 U.S.C. § 2615 ("FMLA"). Ms. Valdez can easily establish a *prima facie* case on each of the claims asserted.

**Defendant's Contentions:**

Methodist denies Plaintiff's claims in their entirety. Methodist employed Plaintiff in June 2021 as a Clinical Research Coordinator in its Clinical Research Institute ("CRI"). In this role, Plaintiff was responsible for coordinating clinical trials and working with third-party clinical trial study monitors and physicians (principal clinical trial investigators) to oversee and document patient participation in the clinical trials (i.e., research studies).

In October 2022, Methodist terminated Plaintiff's employment because of her repeated performance issues and failure to improve despite Methodist providing Plaintiff extensive coaching, training, re-training, extended compliance deadlines, and progressive discipline. Plaintiff's performance issues culminated in an egregious violation of Methodist policy – her failure to timely report a Serious Adverse Event within the Federally mandated 24 hour timeframe, while her assigned patient was in the Intensive Care Unit. Yet, despite what Plaintiff admits was a clear terminable offense, Methodist nevertheless provided Plaintiff with a final opportunity to

improve her performance. When Plaintiff failed to complete an assigned task, for which she had received multiple deadline extensions, Methodist made the decision to terminate her employment.

There is no direct or circumstantial evidence that Plaintiff's sex/pregnancy or engagement in protected activity was a motivating factor, or ever even considered, in Methodist's treatment of Plaintiff during her employment or in its decision to terminate Plaintiff. Nor is there evidence that Methodist interfered with, or retaliated against Plaintiff for requesting or taking, protected leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"). To the contrary, the undisputed evidence, including, most notably, Plaintiff's own deposition admissions, demonstrates that her termination was the final step in Plaintiff's lengthy and documented performance related discipline history. Notably, Methodist's progressive discipline of Plaintiff resulted largely from complaints originating from persons unrelated to Methodist – third-party clinical trial study monitors – who had no knowledge of Plaintiff's pregnancy or protected activity.

Further, it is undisputed that Methodist previously granted Plaintiff protected FMLA leave, and the supervisor whom Plaintiff alleges "targeted" her is the same individual who took additional steps to coach Plaintiff, train Plaintiff, re-train Plaintiff, and even ensure Plaintiff's week-long pregnancy-related leave of absence was deemed protected under the FMLA. The fact that Methodist ultimately terminated Plaintiff's employment for performance issues before she took another FMLA leave is not evidence that Methodist discriminated against Plaintiff, retaliated against her, or otherwise interfered with her rights under the FMLA. In reality, the fact that Methodist repeatedly re-trained and coached Plaintiff despite her repeated egregious policy violations and poor performance evidences Methodist's continued good faith efforts to try to help Plaintiff succeed.

Therefore, Plaintiff cannot establish her sex/pregnancy discrimination claim, her retaliation claim, or her FMLA interference claim, for the following reasons:

1.    Plaintiff cannot establish that Methodist treated a similarly situated, non-pregnant employee more favorably.

2.    Methodist had legitimate, non-discriminatory reasons for its decision to terminate Plaintiff.

3.    Plaintiff cannot demonstrate that Methodist's legitimate, non-discriminatory reasons for terminating her were pretextual or a motivating factor in its decision.

4.    Plaintiff cannot demonstrate that but for her engaging in protected activity, she would not have been discharged.

5.    Methodist had legitimate, non-retaliatory reasons for its decision to terminate Plaintiff.

6.    Plaintiff cannot demonstrate that its legitimate, non-retaliatory reasons for terminating her were pretextual.

7.    Plaintiff cannot demonstrate that Methodist denied her benefits to which she was entitled under the FMLA.

8.    Plaintiff cannot demonstrate that Methodist's legitimate reasons for terminating her employment was pretext for unlawful retaliation under the FMLA.

Moreover, Methodist asserts the following affirmative and other defenses to Plaintiff's claims:

1.    At all times, Plaintiff's employment was terminable at will by either Plaintiff or Methodist, with or without cause or notice.

2.      Without admitting liability, Methodist states that Plaintiff's damages and losses, if any, should be reduced by any and all interim earnings and/or benefits, including unemployment compensation and subsequent employment.

3.      Plaintiff was terminated for legitimate, non-discriminatory, non-retaliatory, non-pretextual business reasons.  Plaintiff's sex, pregnancy, alleged protected activity, and/or any request or need for leave under FMLA, played no role in Methodist's decisions with regard to Plaintiff's employment or termination.

4.      At all times during Plaintiff's employment, Methodist made good faith efforts to comply with Chapter 21 of the Texas Labor Code, the FMLA, and all other applicable laws with regard to Plaintiff's employment without any intent to, and did not, discriminate or retaliate against Plaintiff.

5.      Methodist took no actions with respect to Plaintiff's employment that were contrary to any applicable law.  Plaintiff's sex, pregnancy, alleged protected activity, prior or expected FMLA leave, and any other unlawful criteria were not a factor in any decision made by Methodist with respect to Plaintiff's employment.

6.      Plaintiff's claims for discrimination, retaliation, and FMLA interference are barred because she cannot establish a prima facie case of discrimination, retaliation, or FMLA interference or retaliation.

7.      Plaintiff's claims for discrimination and retaliation are barred because she cannot prove that Methodist's legitimate, non-discriminatory and non-retaliatory reasons for its employment actions are pretextual or that, but for her alleged protected activity, she would not have been terminated.

8.      Plaintiff's claims are barred because Methodist would have made the same decisions regarding her employment even if she had not taken, requested or indicated the need for FMLA leave.

9.      Plaintiff's claims for money damages, attorneys' fees, and costs of court are barred, in whole or in part, because Methodist would have made the same decisions regarding Plaintiff's employment in the absence of any alleged impermissible motivating factor, if such is found to have occurred, although such is not admitted hereby or herein.

10.     Without admitting any liability, Methodist states that any claim for front pay including, without limitation, future lost wages and benefits and future lost income, is moot and too speculative to be permitted.

11.     Methodist acted in good faith as to Plaintiff's statutory rights and has never acted with malice or with reckless indifference as to those rights so as to be liable for any claim or damages at issue herein.

12.     Without admitting any liability, Plaintiff's claim for punitive damages is barred because any alleged actions by Methodist's employee(s), if they are found to have occurred, were contrary to Methodist's good faith efforts to comply with the Texas Labor Code, the FMLA, and all other applicable laws with regard to Plaintiff's employment.

13.     To the extent Plaintiff seeks remedies beyond those available under Chapter 21 of the Texas Labor Code and the FMLA, such remedies are improper.

14.     Plaintiff is not entitled to punitive or exemplary damages under the FMLA.  In addition, the amount of compensatory and/or punitive damages sought by Plaintiff is limited by the provisions of Section 21.2585 of the Texas Labor Code, Chapters 41 and 84 of the Texas Civil Practice & Remedies Code and 42 U.S.C. Section 1981a(b)(3).

15.     Methodist alleges that the award of punitive damages, if any, is unconstitutional or, alternatively, that the standards for the assessment and award of such damages are unconstitutional. Further, to allow an award of punitive damages based, in whole or in part, on the wealth of Methodist would deny Methodist its right to equal protection under the 5th and 14th Amendments to the United States Constitution, as well as Article 1, Section 3 of the Constitution of the State of Texas.  In the event such damages are recoverable, Methodist would affirmatively aver that the amount recoverable, if any, is governed by the Texas Labor Code, the Texas Civil Practice and Remedies Code, the FMLA, and any other applicable law.

16.     As a result of Plaintiff's action herein, Methodist has been required to retain the services of the undersigned attorneys, and pursuant to applicable statutes, Methodist is entitled to an award of its reasonable attorneys' fees incurred in defending this action.

17.     Plaintiff is not entitled to duplicative remedies for the same underlying actions or omissions under the various statutes invoked in this action.  Plaintiff is required to elect her remedies.

**B.    Statement of Stipulated Facts**

1.     Ms. Valdez began her employment with Methodist in September 2018 at The Liver Institute.

2.     In June 2021, Methodist hired Ms. Valdez to work at its Clinical Research Institute ("CRI") as a Clinical Research Coordinator.

3.     Jeny Rendon was Ms. Valdez's supervisor when Methodist hired Ms. Valdez to work in the Clinical Research Institute.

4.     After Jeny Rendon's employment with Methodist ended, Priyanka Acharya, then-Director of the CRI, served as the interim manager for approximately six months.

5.      Karen Castro was hired by Methodist to be the Clinical Trials Manager on April 5, 2022.

6.      Methodist maintains a progressive discipline policy, which involves a verbal warning, written warning, final written warning, and termination.

7.      Shortly after Ms. Castro was hired, Ms. Valdez announced to Ms. Castro that she was pregnant.

8.      On August 19, 2022, Ms. Valdez initiated the process to request a leave of absence for maternity leave through AbsenceOne, Methodist's third-party administrator for leaves of absence.

9.      Ms. Valdez did not give birth until October 31, 2022.

10.     On August 22, 2022, Ms. Castro met with Ms. Valdez to discuss her performance.

11.     On August 22, 2022, Ms. Castro received an automated notice from AbsenceOne that Ms. Valdez's last day of work before maternity leave would be October 12, 2022.

12.     On August 22, 2022, Ms. Valdez spoke to and then emailed a member of Methodist's Human Resources team expressing her concern that Ms. Castro was targeting her and attempting to terminate her employment.

13.     Following Ms. Valdez's conversation with HR on August 22, 2022, HR initiated an investigation, which involved speaking with Ms. Castro regarding Ms. Valdez's concerns.

14.     On September 15, 2022, Ms. Valdez received a final written warning.

15.     On September 20, 2022, Ms. Valdez called out of work and informed Ms. Castro and Ms. Acharya that she was going to the doctor.

16.     Ms. Valdez's doctor wrote Ms. Valdez out of work until September 26, 2022.

17.    On October 6, 2024, Ms. Castro prepared a Termination Disciplinary Action and recommended Ms. Valdez's termination.

18.    On October 12, 2022, Methodist delivered the Termination Disciplinary Action to Ms. Valdez and terminated her employment.

## C.    Contested Issues of Fact

Listing a contested issue of fact in the section above does not constitute an agreement or admission that the contested issue of fact is relevant to the resolution of the case or that evidence concerning that issue is relevant or admissible.

If the Court finds that any of these contested issues of fact are more properly characterized as issues of law, the Parties respectfully request that they be considered issues of law. Further, by listing these items as contested issues of fact, neither Party waives any right to argue, at the appropriate time during trial, that it is entitled to judgment as a matter of law on any issue in the case.

**Plaintiff's Issues:**

1.    From the start of Ms. Valdez's employment until Ms. Castro became her supervisor, Ms. Valdez did not receive any disciplinary action.

2.    When Ms. Valdez transitioned into the Clinical Research Coordinator role, Ms. Valdez received inadequate training and had no direct manager for over six months.

3.    While Ms. Acharya served as the interim manager, she often did not know the answers to the questions Ms. Valdez asked.

4.    Ms. Castro was informed when she started the position that multiple coordinators had expressed a lack of sufficient training.

5.    Ms. Valdez was not the only coordinator who struggled with new methods and expectations introduced by Ms. Castro.

6.    Ms. Castro had to retrain the team on how to properly record medical history.

7.    Following Ms. Valdez's pregnancy announcement, Ms. Castro began scrutinizing Ms. Valdez's performance.

8.    Ms. Valdez was told by multiple co-workers that Ms. Castro intended to terminate her before she began maternity leave.

9.    In a meeting on August 22, 2022, Ms. Castro told Ms. Valdez she would be placed on a Performance Improvement Plan for ninety days.

10.    On August 22, 2022, Ms. Valdez informed Human Resources that she believed she was being targeted for termination because of her pregnancy, that Ms. Acharya said her maternity leave would be a burden on her team, and that she was concerned she would be retaliated against for her report.

11.    On August 31, 2022, Ms. Castro gave Ms. Valdez a "final written warning" via email, which was not an appropriate form of disciplinary action.

12.    In response to the August 31, 2022, Ms. Valdez expressed her concerns that she was being blamed for conduct of others and that the training they had received was different than Ms. Castro's expectations.

13.    Ms. Valdez received a "final written discipline" on September 6, 2022, which included problems dating back to January and February 2022, before Ms. Castro worked for Defendant.

14.    On September 8, 2022, Ms. Castro discussed source documenting with Ms. Valdez and told her, "the previous coordinator trained you wrong" and to "doubt every training that you received from the previous coordinator."

15.    On September 12, 2022, Ms. Castro gave Ms. Valdez her performance evaluation. Ms. Valdez requested bi-weekly meetings to establish a better employee-manager relationship, but Ms. Castro declined the request.

16.    On September 15, 2022, Ms. Valdez received a final written discipline for false reasons and unreasonable deadlines

17.    After receiving the final written discipline, Ms. Valdez met with Ms. Parker to discuss her concerns and the way Ms. Castro spoke to her during the meeting.

18.    Soon after, there was a meeting with Ms. Valdez, Ms. Castro, Ms. Parker, and an unknown male HR representative to try to "clear the air on some of the issues."

19.    On September 21, 2022, while on medical leave for high blood pressure, Ms. Valdez received a message from a peer encouraging her to go on leave prior to her originally planned date because she believed Ms. Castro was going to fire her.

20.    While Ms. Valdez was on medical leave, Ms. Castro evaluated her absences and inquired about issuing disciplinary action.

21.    When Ms. Valdez returned from medical leave on September 26, 2022, Ms. Castro continued scrutinizing Ms. Valdez's performance and having unreasonable expectations.

22.    On September 27, 2022, an individual came in for an interview for the coordinator position. The coordinators were confused because there was no position open at that time. Ms. Castro did not respond when she was asked where the new hire would sit.

23.    On September 29, 202, Ms. Valdez contacted Human Resources again expressing her concerns that she was targeted to be fired before maternity leave.

24.    On October 6, 2022, Ms. Castro emailed Ms. Parker asking to speak regarding Ms. Valdez's performance.

25.    Ms. Castro recommended termination to Human Resources.

26.    On October 10, 2022, Ms. Acharya met with Ms. Valdez to discuss tasks to be completed before her leave began. Ms. Acharya confirmed Ms. Valdez's due date and that she intended to work until her due date on October 30, 2022.

**Defendant's Issues:**

1.    In her role as a Clinical Research Coordinator, Plaintiff was responsible for, among other things, coordinating clinical trials and working with third party clinical trial study monitors and physicians (principal clinical trial investigators) to oversee and document patient participation in the clinical trials.

2.    As part of her duties, Plaintiff was responsible for reviewing, learning, and following a written "protocol" for each clinical trial assigned to her.

3.    The protocol for a clinical trial is provided by the clinical trial study monitors – third-parties unaffiliated with Methodist – and is designed to safeguard the integrity of the clinical trial and the health of clinical trial participants.

4.    The clinical trial protocol contains information such as the number of participants (also known as "subjects") needed for the clinical trial and the schedule of activities for the clinical trial (e.g., tests, procedures, or drugs and their dosages).

5.    EPIC software is the messaging system utilized by Methodist clinical research coordinators and others to communicate with patients in a clinical trial and record, among other things, Adverse Events, also known as AEs, and Serious Adverse Events, also known as SAEs.

6.    Staff members assigned to use EPIC are required to check their EPIC messages daily for, among other things, clinical trial participants reporting they suffered an AE or SAE.

7.     Plaintiff was also responsible for, among other things: (1) checking her messages daily via EPIC; and (2) timely reporting Adverse Events and Serious Adverse Events pursuant to Methodist policy, Methodist standard operating procedures, and federal law.

8.     James Lynch is a third-party clinical trial monitor employed by PPD, Thermo Fisher Scientific, and with whom Plaintiff worked on the Cymabay clinical trial.

9.     One of Plaintiff's Methodist job duties was to respond to questions from clinical trial monitors.

10.     Plaintiff could be disciplined for failing to respond to questions from clinical trial monitors.

11.     On May 2, 2022, James Lynch emailed Ms. Castro regarding Plaintiff being unresponsive to his emails for several months.

12.     In his May 2, 2022 email, Mr. Lynch noted that Plaintiff could have resolved the unresponsiveness issue with open communication, but Plaintiff repeatedly failed to respond to Mr. Lynch regarding questions about the Cymabay clinical trial for which Plaintiff was assigned.

13.     Methodist's progressive discipline policy involves a verbal warning, written warning, final written warning, and termination, unless circumstances warrant otherwise.

14.     Depending on the specific situation, and especially in cases involving egregious policy violations, Methodist may skip steps in its progressive discipline policy.

15.     Ms. Castro did not discipline Plaintiff after receiving the May 2, 2022 email from Mr. Lynch, but instead coached Plaintiff on her job duties.

16.     Nickolas Wilson is a third-party clinical trial study monitor employed by ICON PLC and with whom Plaintiff worked on the MGL-18 clinical trial.

17.    On May 23, 2022, Mr. Wilson emailed Plaintiff twice to: (1) request information from Plaintiff regarding her assigned clinical trial; and (2) understand why certain data was missing from Plaintiff's assigned clinical trial, something for which she was responsible for correcting.

18.    On June 1, 2022, Mr. Lynch emailed both Ms. Castro and Plaintiff regarding Plaintiff's continued failure to respond to his emails.

19.    Plaintiff's failure to respond to emails from third-party monitors was a legitimate reason for Methodist to discipline Plaintiff.

20.    Methodist did not discipline Plaintiff for Mr. Wilsons's initial complaint or Mr. Lynch's first two complaints.

21.    Methodist, through Ms. Castro, continued coaching Plaintiff instead of disciplining her for her poor performance following Mr. Lynch's and Mr. Wilson's email complaints.

22.    During the coaching, Ms. Castro provided Plaintiff detailed instructions and processes that Plaintiff was expected to follow moving forward.

23.    Plaintiff thanked Ms. Castro via email for the re-training she received following Mr. Lynch's and Mr. Wilson's initial complaints.

24.    On July 1, 2022, Mr. Lynch emailed Plaintiff a third time complaining about Plaintiff's failure to comply with and her failure to enter data into the clinical trial database.

25.    Plaintiff was responsible for the specific job functions about which Mr. Lynch and Mr. Wilson complained.

26.    Methodist did not discipline Plaintiff following three complaints from Mr. Lynch and two complaints from Mr. Wilson.

27.    It was reasonable for Ms. Castro to scrutinize Plaintiff's work due to receiving the third-party clinical monitors' complaints.

28.    On July 19, 2022, Ms. Castro emailed Dr. Crystee Cooper, Methodist's Vice President responsible for the CRI, regarding Plaintiff's ongoing performance issues.

29.    Methodist did not discipline Plaintiff, but instead Ms. Castro blocked Plaintiff's entire day so Plaintiff could focus solely on fixing the missing clinical trial data.

30.    Ms. Castro worked side by side with Plaintiff to ensure open queries and missing pages were completed.

31.    Plaintiff found it to be helpful that Ms. Castro assigned Plaintiff's patients to other employees for the day so that Plaintiff and Ms. Castro could focus on correcting the missing data together.

32.    When Ms. Castro and Plaintiff reviewed the deficient clinical trial data, Ms. Castro learned that the bulk of the missing data and queries came from Plaintiff's incorrect documentation and data entry pertaining to procedures and Adverse Events.

33.    From April to July 2022, Ms. Castro had observed missing data and incorrect documentation and data entry across multiple studies assigned to Plaintiff.

34.    Methodist did not discipline Plaintiff, but chose instead to  schedule a training session with Plaintiff and Ms. Castro on July 25, 2022.

35.    During the July 25, 2022 training session, Ms. Castro provided Plaintiff helpful information regarding collecting and correcting clinical trial data.

36.    Following the re-training session on July 25, 2022, Ms. Castro assigned a related clinical trial data entry task to Plaintiff.

37.    It was reasonable to complete the July 25, 2022 data entry task by 4:30 pm on the same day because Plaintiff only had one scheduled patient visit on that day.

38.    When submitting her completed assignment on July 25, 2022, Plaintiff thanked Ms. Castro for the re-training and acknowledged again that she had the training that she needed to be able to do her job correctly.

39.    In her leave of absence request, Plaintiff listed October 12, 2022 as her last day of work before taking maternity leave.

40.    Despite Ms. Castro's efforts to provide Plaintiff additional training and resources necessary to help Plaintiff successfully perform her clinical research job duties, Plaintiff's performance did not improve.

41.    Plaintiff's performance issues progressed into serious violations of Methodist's policies.

42.    During the August 22, 2022 meeting, Ms. Castro raised the possibility of placing Plaintiff on a Performance Improvement Plan ("PIP") due to her ongoing performance issues.

43.    Due to Plaintiff's repeated performance issues, Methodist could have placed Plaintiff on a PIP on August 22, 2022.

44.    Ms. Castro never actually placed Plaintiff on a PIP.

45.    By August 22, 2022 – nearly four months after Plaintiff announced her pregnancy – Plaintiff had received no formal discipline.

46.    During the August 22, 2022 meeting, Plaintiff told HR that Ms. Castro made comments about Plaintiff and a co-worker, and also took issue with Ms. Castro making arrangements to assign Plaintiff's studies to another clinical research coordinator during Plaintiff's upcoming maternity leave.

47.    Ms. Castro denied to HR targeting Plaintiff and making the comments about Plaintiff and a co-worker.

48.    Ms. Castro explained to HR that her involvement of other coordinators in Plaintiff's studies was to ensure Plaintiff's studies had necessary coverage during Plaintiff's expected absence.

49.    HR was not able to substantiate Plaintiff's allegations that Ms. Castro was targeting her.

50.    As part of the ongoing investigation resulting from Plaintiff's August 22, 2022 complaint, HR continued working closely with Plaintiff through the entirety of her Methodist employment to clarify any concerns and help her understand that Ms. Castro's criticisms were based on Plaintiff's work not getting done.

51.    "AE" stands for "Adverse Event," which is a negative side effect that a patient experiences (e.g., from a drug) during a clinical trial.

52.    Third-party protocols and Methodist policies require that clinical research coordinators must timely and correctly track and report any AEs reported by a clinical trial participant.

53.    Timely reporting AEs is important and required by federal law.

54.    Timely reporting AEs experienced by clinical trial participants was one of Plaintiff's job duties as a clinical research coordinator.

55.    Failing to report AEs can seriously jeopardize the safety of the clinical trial participants and the integrity of the clinical trial itself.

56.    On August 26, 2022, Mr. Lynch emailed Plaintiff and Ms. Castro a fourth time regarding Plaintiff's long delays without reporting AEs.

57.     After Ms. Castro received the August 26, 2022 email from Mr. Lynch and reviewed the clinical trial information, Ms. Castro discovered that Plaintiff never reported an AE to Mr. Lynch that occurred in February 2022.

58.     Following Methodist's discovery of the missed AE, Methodist issued Plaintiff her first formal discipline on August 30, 2022 – a verbal warning.

59.     It was reasonable for Plaintiff to receive a verbal warning for not timely reporting an AE.

60.     Failing to report an AE is, on its own, a terminable offense.

61.     On September 5, 2022, Mr. Lynch emailed Ms. Castro a fifth time regarding Plaintiff's clinical trial related failures.  In this instance, Plaintiff failed to correct source documents in a clinical trial despite several prior requests Plaintiff received from Mr. Lynch that Plaintiff do so.

62.     Due to the email Methodist received on September 5, 2022, on September 6, 2022, Plaintiff received her first written warning from Methodist.

63.     Plaintiff had previously received re-training on all of the issues in the first written warning.

64.     Methodist's issuance of the first written warning to Plaintiff was reasonable.

65.     On September 6, 2022, Ms. Castro assigned two tasks to Plaintiff with a due date of September 9, 2022.

66.     Serious Adverse Events, also known as SAEs, are serious adverse occurrences experienced by individuals participating in a clinical trial.

67.     Reporting Serious Adverse Events are important to the validity of the clinical trial, but also to the safety of the individuals participating in the clinical trial.

68.     Federal regulations, Methodist policies and Methodist standard operating procedures require that, upon Methodist's receipt of notice of an SAE by a clinical trial participant, it must be reported by the clinical trial site (i.e., Methodist) and/or the principal investigator to the clinical trial sponsor within 24 hours.

69.     On September 8, 2022, the spouse of a clinical trial participant who was participating in a clinical trial assigned to Plaintiff reported an SAE to Plaintiff via EPIC.

70.     The clinical trial participant reported via EPIC on September 8, 2022 had suffered a serious adverse reaction and was in the intensive care unit in the hospital.

71.     Plaintiff did not check her EPIC messages on September 8, September 9, or September 12, 2022 as required.

72.     Plaintiff had previously received training and retraining on how to report AEs and SAEs.

73.     Plaintiff had previously received training and retraining on the requirement that she must check her EPIC messages daily.

74.     On September 15, 2022, Plaintiff received a final written warning due to the fact she failed to check her EPIC messages daily and failed to timely report an SAE.

75.     As a result of the missed SAE reporting, Methodist was required to create a Corrective and Preventative Action Plan, also known as a "CAPA," related to the SAE by September 16, 2022.

76.     Methodist's Manager, Research Regulatory Compliance, Colette Ngo Ndjom, emailed Plaintiff on September 14, 2022 to explain that Plaintiff's failure to timely report the SAE also resulted in a major clinical trial protocol deviation.

77.     The CAPA deadline is set by federal law.

78.     The CAPA could have been avoided if Plaintiff reported the SAE timely as required.

79.     Plaintiff completed the CAPA and submitted it to Ms. Ndjom timely as requested.

80.     On September 21, 2022, HR emailed Plaintiff that, "Per policy HR196 an employee must apply for applicable leave after three consecutive absences within 72 hours.  If an employee does not apply for applicable leave, each day missed will count as an occurrence."

81.     HR also stated in its September 21, 2022 email to Plaintiff that "All leave requests are administered through AbsenceOne.  You will need to submit a claim by clicking on the link below or calling them directly."

82.     In addition to applying for a protected leave of absence through AbsenceOne, HR instructed Plaintiff that she needed to contact Methodist's benefits department about her leave of absence.

83.     Plaintiff contacted Methodist's benefits department about her September 20-26 leave of absence.

84.     Plaintiff did not contact AbsenceOne about requesting a protected leave of absence from September 20-26 when first instructed.

85.     Managers typically receive notifications from AbsenceOne when a subordinate is approved for a protected leave of absence.

86.     Methodist allowed Plaintiff to take her requested leave from September 20–26.

87.     Plaintiff had no issues receiving her requested leave from September 20-26.

88.     Plaintiff returned from leave on September 26, 2022.

89.    On September 27, Ms. Castro emailed Plaintiff asking if she had applied for or received approval for her September 20-26th leave per the instructions provided by HR because Ms. Castro had not yet received an approved FMLA leave notification from AbsenceOne.

90.    Plaintiff confirmed that she never contacted AbsenceOne prior to Ms. Castro's inquiry.

91.    Upon Plaintiff's return from her week-long leave, Ms. Castro directed Plaintiff to fill out the appropriate FMLA forms with AbsenceOne so that the absences would be considered protected by the FMLA and Methodist's policy.

92.    If Ms. Castro did not direct Plaintiff to fill out the AbsenceOne forms, the absences would have been deemed unprotected.

93.    Ms. Castro was helping Plaintiff by advising Plaintiff to apply for protected leave.

94.    Upon her return from FMLA leave on September 26, 2022, Ms. Castro provided Plaintiff a detailed priority list outlining the tasks that had been assigned to her prior to her FMLA leave, along with updated deadlines.

95.    At various times, Ms. Castro outlined priority tasks in a similar manner for other Clinical Research Coordinators.

96.    Ms. Castro sent Plaintiff the list of priority tasks and deadlines so there could be no question as to the tasks expected of her now that she had returned to work and the deadlines by which such tasks needed to be completed.

97.    One of the tasks on the September 26 to-do list was to screen (i.e., call) a clinical trial participant.

98.    Screening a participant takes only 30 minutes to an hour to complete.

99.    Plaintiff failed to complete some of the outstanding tasks re-assigned to her in the September 26 list by the September 30, 2022, deadline, including screening the new participant.

100.    Plaintiff left work early on September 26, 2022, but Ms. Castro accounted for that early departure by further extending some of the deadlines on Plaintiff's to-do list.

101.    Methodist did not discipline Plaintiff for failing to complete tasks by their due date, but instead Ms. Castro extended Plaintiff's deadline to screen the patient to October 3, 2022.

102.    On October 3, Plaintiff informed Ms. Castro that she still had not completed the patient screening.

103.    It became apparent to Ms. Castro on October 3, 2022 that Plaintiff was not going to improve her performance.

104.    Plaintiff's termination required multiple levels of approval before being finalized.

**D.    Contested Issues of law**

**Plaintiff's Issues:**

a.    Whether Ms. Valdez's sex/gender/pregnancy was a motivating factor in Defendant's decision to terminate her employment.

b.    Whether Defendant would have terminated Ms. Valdez's employment even had it not improperly considered Ms. Valdez's sex/gender/pregnancy.

c.    Whether Defendant interfered with Ms. Valdez's FMLA leave rights by denying her available FMLA leave.

d.    Whether Defendant retaliated against Ms. Valdez for engaging in protected activity under TCHRA.

e.    Whether Defendant discriminated against Ms. Valdez for engaging in protected activity under FMLA, including requesting FMLA leave.

f.    Whether Defendant's wrongful actions, if any, caused Ms. Valdez damages.

g.    If Defendant's wrongful actions, if any, caused Ms. Valdez damages, what amount of money, if paid now in cash, would fairly and reasonably compensate Ms. Valdez for those damages.

    h. Whether Defendant's conduct was done with malice or reckless indifference to Ms. Valdez's state and federally protected rights.

    i. Whether punitive damages should be assessed against Defendant.

**Defendant's Issues:**

    a. Whether sex or pregnancy was a motivating factor in Methodist's decision to terminate Plaintiff's employment.

    b. Whether Methodist terminated Plaintiff's employment because she made a complaint of discrimination.

    c. The sum of money, if any, which would fairly and reasonably compensate Plaintiff for her damages that resulted from Defendant's alleged unlawful discrimination or retaliation.

    d. Whether, by clear and convincing evidence, Methodist discriminated or retaliated against Plaintiff with malice or with reckless indifference to the right of Plaintiff to be free from such practices.

    e. The sum of money, if any, which should be assessed against Methodist and awarded to Plaintiff as exemplary damages for its alleged discrimination or retaliation with malice or with reckless indifference to the right of Plaintiff to be free from such practices.

    f. Whether Methodist would have terminated Plaintiff Gloria Valdez but for her request to take leave under the FMLA.

    g. The sum of money which would fairly and reasonably compensate Plaintiff for the damages Methodist allegedly caused her by terminating her employment because she requested to take leave under the FMLA.

**E.    Estimate of Length of trial**

This case is a jury trial. The Parties believe it will take three to four days to try this case, including jury selection and excluding jury deliberation.

**F.    Additional Matters That Might Aid in Disposition of the Case**

**Exhibits:**

Legible photocopies of printed publications may be offered and received in evidence in lieu of originals thereof. The Parties agree to meet and confer in good faith to resolve objections

to trial exhibits prior to their introduction at trial. Each Party has the right to use an exhibit on either Party's exhibit list, even if not introduced by the designating party, subject to all evidentiary objections. However, the listing of an exhibit by a Party on its exhibit list does not waive any evidentiary or other objections to that exhibit by the listing Party, should the opposing party attempt to offer it into evidence. Any exhibit, once admitted into evidence by the Court, may be used equally by each Party. Any exhibit listed on any Party's exhibit list, as to which no objection remains pending at the time of opening statements, may be shown to the jury during opening statements. Only admitted exhibits may be used during closing statements.

**Witnesses:**

No later than by 7:00 p.m. (CT) one day before their introduction (i.e., Tuesday evening for a witness to be called on Wednesday), counsel shall provide to opposing counsel the names and order of witnesses to be called. If counsel intends to change the order of witnesses, they shall notify the other side immediately.

**Plaintiff's Additional Issues:**

Plaintiff believes a jury trial is necessary for the disposition of the case.

**Defendant's Additional Issues:**

There are two pending motions and pretrial objections to be resolved that would aid the Court in the disposition of this case, including a pending Motion for Summary Judgment.

On August 14, 2024, Methodist filed a Motion for Summary Judgment, along with a brief, appendix, and confidential appendix in support (Docs. 22, 23, 24, 26) in which Methodist sought to dismiss all of Ms. Valdez's claims in this case. Methodist's Motion for Summary Judgment has been fully briefed and is ripe for consideration by the Court. Simultaneous with its Reply in Support of Motion for Summary Judgment (Doc. 33), Methodist filed its Motion to Strike

Statements in Plaintiff's Summary Judgment Response, and Brief in Support (Doc. 34), requesting that the Court strike Ms. Valdez's inadmissible hearsay and unsubstantiated, self-serving and conclusory statements contained in Plaintiff's Brief in Support of Response to Defendant's Motion for Summary Judgment (Doc. 30). Methodist's Motion to Strike has been fully briefed and is ripe for the Court's consideration in connection with Methodist's Motion for Summary Judgment.

On September 27, 2024, the parties each filed their Pretrial Disclosures. Docs. 35, 36. Plaintiff filed her First Amended Pretrial Disclosures on October 9, 2024. Doc. 38. On October 11, 2024, the parties each filed their Objections to Pretrial Disclosures (Docs. 39, 40, 41[1]). The Court's ruling on these pending objections will be necessary prior to the commencement of trial in order to identify the scope of the parties' trial witnesses and exhibits.

APPROVED AS TO FORM AND SUBSTANCE

/s/ Brittney L. Thompson
MATTHEW R. SCOTT
Texas Bar No. 00794613
matt@sgtlawgroup.com
JAMIE J. GILMORE
Texas Bar No. 24045262
jamie@sgtlawgroup.com
BRITTNEY L. THOMPSON
Texas Bar No. 24104618
brittney@sgtlawgroup.com
**SCOTT GILMORE THOMPSON PLLC**
Founders Square
900 Jackson Street, Suite 550
Dallas, Texas 75202
214-965-9675 / 214-965-9680 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

---

[1] Methodist timely filed its Amended Objections to Pretrial Disclosures on the same day as its initial Objections to Pretrial Materials.

*/s/ Robin G. Shaughnessy*
Paul G. Nason
State Bar No. 00797926
pnason@lockelord.com
Robin G. Shaughnessy
State Bar No. 24012713
rshaughnessy@lockelord.com
Seth M. Roberts
State Bar No. 24051255
sroberts@lockelord.com
Aaron S. Nava
State Bar No. 24134375
aaron.nava@lockelord.com
**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000 (Telephone)
(214) 740-8800 (Telecopier)
**ATTORNEYS FOR DEFENDANT**

This Joint Pre-Trial Order is hereby approved this ___ day of _____, 2024.

_____

HON. JANE BOYLE
UNITED STATES DISTRICT JUDGE